UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ALANA SOUZA, *et al.*,<br><br>                                Plaintiffs,<br><br>                    v.<br><br>EXOTIC ISLAND ENTERPRISES, INC., *et al.*,<br><br>                                Defendants. | No. 18-CV-9448 (KMK)<br><br>OPINION & ORDER |

Appearances:

John Vincent Golaszewski, Esq.
Casas Law Firm, P.C.
New York, NY
*Counsel for Plaintiffs*

Joseph Edward O'Connor, Esq.
Mainetti, Mainetti & O'Connor, P.C.
Kingston, NY
*Counsel for Defendant Exotic Island Enterprises, Inc.*

Michael Edward Kolb, Esq.
O'Connor & Partners, PLLC
Kingston, NY
*Counsel for All Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiffs Alana Souza, also known as Alana Campos ("Campos"), Brooke Banx

("Banx"), Brooke Taylor-Johnson ("Taylor-Johnson"), Jaclyn Swedberg ("Swedberg"), Jaime

Edmondson-Longoria ("Edmondson-Longoria"), Jessica Hinton, also known as Jessa Hinton

("Hinton"), Tiffany Toth-Gray ("Toth-Gray"), and Ursula Sanchez, also known as Ursula Mayes

("Mayes"; collectively, "Plaintiffs") bring this Action, pursuant to the Lanham Act, 15 U.S.C.

§ 1125 *et seq*., and New York state law, against Exotic Island Enterprises, Inc. ("Exotic Island"),

doing business as Mansion Gentlemen's Club & Steakhouse ("Mansion"), and Keith Slifstein

("Slifstein"; together, "Defendants").  (*See* Compl. (Dkt. No. 4).)  Plaintiffs allege that

Defendants without permission used Plaintiffs' images to promote Defendants' business.  (*Id*.)

Before the Court are Plaintiffs' Motion For Summary Judgment ("Plaintiffs' Motion"), (Not. of

Mot. ("Pls.' Mot.") (Dkt. No. 41)), and Defendants' Motion For Summary Judgment and To

Exclude Testimony of Plaintiffs' Expert Witnesses Martin Buncher and Stephen Chamberlin

("Defendants' Motion"), (Not. of Mot. ("Defs.' Mot.") (Dkt. No. 45)).  For the reasons that

follow, Plaintiffs' Motion is denied, and Defendants' Motion is granted insofar as it seeks

summary judgment and to exclude certain testimony of Martin Buncher.

## I.  Background

### A.  Factual Background

The following facts are either undisputed or, because the Court grants Defendants'

Motion and denies Plaintiffs' Motion, construed in the light most favorable to Plaintiffs.

Plaintiffs are professional models.  (Pls.' Local Rule 56.1 Statement of Undisputed

Material Facts ("Pls.' SMF") ¶¶ 9, 13, 17, 21, 25, 29, 32, 36 (Dkt. No. 44); Transmittal Decl. of

John V. Golaszewski ("Golaszewski Decl.") Ex. B ("Campos Decl.") ¶ 2 (Dkt. No. 43-2);

Golaszewski Decl. Ex. C ("Banx Decl.") ¶ 2 (Dkt. No. 43-3); Golaszewski Decl. Ex. D ("Taylor-

Johnson Decl.") ¶ 2 (Dkt. No. 43-4); Golaszewski Decl. Ex. E ("Swedberg Decl.") ¶ 2 (Dkt. No.

43-5); Golaszewski Decl. Ex. F ("Edmondson-Longoria Decl.") ¶ 2 (Dkt. No. 43-6);

Golaszewski Decl. Ex. G ("Hinton Decl.") ¶ 2 (Dkt. No. 43-7); Golaszewski Decl. Ex. H ("Toth-

Gray Decl.") ¶ 2 (Dkt. No. 43-8); Golaszewski Decl. Ex. I ("Mayes Decl.") ¶ 2 (Dkt. No. 43-9).)

Each has enjoyed commercial success, including, for example, appearances in magazines, ad

campaigns, TV shows, films, and at events.  (Pls.' SMF ¶¶ 9, 13, 17, 21, 25, 29, 32, 36; Campos

Decl. ¶ 2; Banx Decl. ¶ 2; Taylor-Johnson Decl. ¶ 2; Swedberg Decl. ¶ 2; Edmondson-Longoria

Decl. ¶ 2; Hinton Decl. ¶ 2; Toth-Gray Decl. ¶ 2; Mayes Decl. ¶ 2.)  Each has a significant

number of followers on various social media platforms, ranging from greater than ten thousand

to several million.  (Pls.' SMF ¶¶ 9, 13, 17, 21, 25, 29, 32, 36; Campos Decl. ¶ 3; Banx Decl. ¶ 3;

Taylor-Johnson Decl. ¶ 3; Swedberg Decl. ¶ 3; Edmondson-Longoria Decl. ¶ 3; Hinton Decl.

¶ 3; Toth-Gray Decl. ¶ 3; Mayes Decl. ¶ 3.)  All Plaintiffs except Taylor-Johnson and Mayes are

considered social media influencers.  (Campos Decl. ¶ 3; Banx Decl. ¶ 3; Swedberg Decl. ¶ 3;

Edmondson-Longoria Decl. ¶ 3; Hinton Decl. ¶ 3; Toth-Gray Decl. ¶ 3.)  Plaintiffs attest that

they "have achieved celebrity status and fame" and that "[o]n any given day, regardless of where

[they are] at, [they are] recognized by complete strangers and [their] fans who follow [them] on

social media."  (Campos Decl. ¶ 4; Banx Decl. ¶ 4; Taylor-Johnson Decl. ¶ 4; Swedberg Decl.

¶ 4; Edmondson-Longoria Decl. ¶ 4; Hinton Decl. ¶ 4; Toth-Gray Decl. ¶ 4; Mayes Decl. ¶ 4.)

Plaintiffs earn their livings by promoting their image for the benefit of various clients,

commercial brands, media, and entertainment outlets.  (Campos Decl. ¶ 5; Banx Decl. ¶ 5;

Taylor-Johnson Decl. ¶ 5; Swedberg Decl. ¶ 5; Edmondson-Longoria Decl. ¶ 5; Hinton Decl.

¶ 5; Toth-Gray Decl. ¶ 5; Mayes Decl. ¶ 5.)  Because they rely on their reputation to get work,

Plaintiffs are selective about the jobs they take, and exercise "complete control" over the use of

their images and likenesses.  (Campos Decl. ¶¶ 6–8; Banx Decl. ¶¶ 6–8; Taylor-Johnson Decl.

¶¶ 6–8; Swedberg Decl. ¶¶ 6–8; Edmondson-Longoria Decl. ¶¶ 6–8; Hinton Decl. ¶¶ 6–8; Toth-

Gray Decl. ¶¶ 6–8; Mayes Decl. ¶¶ 6–8.)  This is particularly true on social media, where images

of Plaintiffs can be difficult to find and remove, remain available via search, and may be

refreshed or highlighted by a user interaction even years after they are posted.  (Campos Decl.

¶ 9; Banx Decl. ¶ 9; Taylor-Johnson Decl. ¶ 9; Swedberg Decl. ¶ 9; Edmondson-Longoria Decl.

¶ 9; Hinton Decl. ¶ 9; Toth-Gray Decl. ¶ 9; Mayes Decl. ¶ 9.)

Slifstein is the President of Exotic Island.  (Defs.' Statement Pursuant to Local Rule 56.1 ("Defs.' SMF") ¶ 984 (Dkt. No. 47); Pls.' Resp. to Defs.' SMF ("Pls.' Resp. SMF") ¶ 984 (Dkt. No. 57); Aff. of Def. Keith Slifstein ("Slifstein Aff.") ¶ 3 (Dkt. No. 49).)  Exotic Island operates Mansion.  (Defs.' SMF ¶ 985; Pls.' Resp. SMF ¶ 985; Slifstein Aff. ¶ 3.)  Plaintiffs allege that Mansion "engages or has engaged in the business of selling alcohol and food in an atmosphere [where] nude and/or semi-nude women entertain the [business's] clientele."  (Compl. ¶ 50.)[1] Mansion maintains social media accounts, including at least a Facebook account and an Instagram account.  (Pls.' SMF ¶ 41; Defs.' Resp. SMF ¶ 40; Slifstein Dep. 17.)  Defendants gave third party Defendant Exclusive Events & Promotions Inc., doing business as Think Social First ("Exclusive Events"), complete control over these accounts.  (Pls.' Resp. SMF ¶ 1009; Slifstein Dep. 17–18.)  Exclusive Events promoted Mansion on social media free of charge, with the goal of gaining a foothold in the night club industry.  (Defs.' SMF ¶ 995; Pls.' Resp. SMF ¶ 995; Slifstein Aff. ¶ 9.)  Promotions containing Plaintiffs' images were without Plaintiffs' permission posted to Mansion's social media pages.  (Pls.' SMF ¶¶ 10, 14, 18, 22, 26, 30, 33, 37; Campos Decl. ¶ 13; Banx Decl. ¶ 13; Taylor-Johnson Decl. ¶ 13; Swedberg Decl. ¶ 13; Edmondson-Longoria Decl. ¶ 13; Hinton Decl. ¶ 13; Toth-Gray Decl. ¶ 13; Mayes Decl. ¶ 13; *see also* Compl. Exs. A–H (Dkt. No. 1-1).)

B.  Procedural Background

Plaintiffs filed their Complaint on October 16, 2019.  (Compl. (Dkt. No. 1).)  The Complaint alleges false advertising and false endorsement under the Lanham Act, violation of

---

[1] Plaintiffs purport to provide evidence to support this allegation.  (*See* Pls.' SMF ¶ 40.) However, they reference only unrelated deposition testimony.  (*See* Golaszewski Decl. Ex. J ("Slifstein Dep.") 6 (Dkt. No. 43-10); *see also* Defs.' Resp. to Pls.' SMF ("Defs.' Resp. SMF") ¶ 39 (Dkt. No. 54).)  Because this fact is immaterial to the outcome, the Court notes Plaintiffs' allegation.

Plaintiffs' right to publicity under New York Civil Rights Law ("NYCRL") Sections 50–51, deceptive trade practices under New York General Business Law ("NYGBL") Section 349, and defamation. (Compl. ¶¶ 74–125.) Defendants answered on January 31, 2019. (Dkt. No. 9.) The Court held an initial pretrial conference on May 29, 2019, (Dkt. (minute entry for May 29, 2019)), at which it adopted a Case Management and Scheduling Order, (Dkt. No. 15), and referred the Parties to mediation, (Dkt. No. 16). On November 21, 2019, Defendants requested leave to file a third-party complaint against Exclusive Events, (Dkt. No. 19), which the Court granted, (Dkt. No. 20). Defendants filed their Third Party Complaint on December 4, 2019. (Dkt. No. 21.) On March 4, 2020, the Court held a status conference, (Dkt. (minute entry for Mar. 4, 2020)), at which it adopted a second Case Management and Scheduling Order, (Dkt. No. 25). Upon the conclusion of discovery, the Court on November 6, 2020 held a status conference, at which it adopted a briefing schedule for the Parties' Motions For Summary Judgment and Defendants' Daubert Motion. (Dkt. (minute entry for Nov. 6, 2020); Dkt. No. 38.)

The Parties submitted their opening briefs on February 5, 2021. (Pls.' Mot.; Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Pls.' Mem.") (Dkt. No. 42); Golaszewski Decl. (Dkt. No. 43); Pls.' SMF; Defs.' Mot.; Decl. of Michael Kolb ("Kolb Decl.") (Dkt. No. 46); Defs.' SMF; Aff. ("Klein Aff.") (Dkt. No. 48); Slifstein Aff.; Defs.' Mem. of Law. in Supp. of Defs.' Mot. ("Defs.' Mem.") (Dkt. No. 50).)

On February 9, 2021, the Second Circuit issued an opinion in *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021). *Electra* is similar to the instant Action. There, the plaintiffs—including Hinton, Toth-Gray, and Mayes—alleged that the defendants

misappropriated their images to advertise a strip club.  *See generally id.*[2]  The Second Circuit in

*Electra* considered four of the five causes of action advanced by Plaintiffs in the instant Action:

false endorsement under the Lanham Act, violation of the plaintiffs' right to publicity under

NYCRL Section 51, deceptive trade practices under NYGBL Section 349, and defamation.  *See*

*generally id.*

The Parties submitted their opposition papers on March 12, 2021.  (Defs.' Opp'n; Defs.'

Resp. SMF; Pls.' Mem. of Law in Opp'n to Defs.' Mot. ("Pls.' Opp'n") (Dkt. No. 55);

Transmittal Decl. of John V. Golaszewski ("Golaszewski Opp'n Decl.") (Dkt. No. 56); Pls.'

Resp. SMF.)  Reacting to the Second Circuit's opinion in *Electra*, Plaintiffs withdrew their claim

for deceptive trade practices under NYGBL Section 349 and their defamation claim.  (Pls.'

Opp'n 24–25.)  In addition, Plaintiffs did not respond to Defendants' argument that Plaintiffs'

claims against Slifstein should be dismissed because he was not personally involved in selecting

Plaintiffs' images, and was unaware that use of those images may violate the law.  (*See* Defs.'

Mem. 5.)  The Court deems these claims to be abandoned, dismisses Plaintiffs' deceptive trade

practices claim under NYGBL Section 349 and Plaintiffs' defamation claim, grants summary

judgment for Slifstein, and dismisses all claims against him.  *See Jackson v. Fed. Express*, 766

F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate,

infer from a party's partial opposition that relevant claims or defenses that are not defended have

been abandoned."); *see also Toth*, 2019 WL 95564, at *5 (dismissing all claims against

---

[2] Defendants accurately state that Taylor-Johnson also was a party in this case.  (*See* Defs.' Mem. of Law in Opp'n to Pls.' Mot. ("Defs.' Opp'n") 7 (Dkt. No. 53).)  However, the district court in the *Electra* matter noted that Taylor-Johnson had "withdrawn all claims in this action."  *Toth v. 59 Murray Enterprises, Inc.*, No. 15-CV-8028, 2019 WL 95564, at *1 n.2 (S.D.N.Y. Jan. 3, 2019), *aff'd in part, vacated in part, remanded sub nom. Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021).  Thus, neither the district court nor the Second Circuit considered Taylor-Johnson's claims in *Electra*.

individual defendants where there was "nothing in the record to support a piercing of the corporate veil or any other theory of liability implicating individual defendants").  As a result, only claims against Exotic Island are before the Court, and there are only three of them: false endorsement under the Lanham Act, false advertising under the Lanham Act, and Plaintiffs' NYCRL Section 51 right to publicity claim.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and citation omitted).  Further, "[t]o survive a [summary

judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

        "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

    1.  False Endorsement

Section 43 of the Lanham Act prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  To prevail on a false endorsement claim, "a plaintiff must prove (1) that the mark is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant."  *Electra*, 987 F.3d at 257 (alteration omitted) (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007)).  "To determine the likelihood of consumer confusion, [the Court is to] apply the eight-factor test of *Polaroid Corporation v. Polarad Electronics Corporation*[,] 287 F.2d 492, 495 (2d Cir. 1961)."  *Electra*, 987 F.3d at 257 (citing *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013)).  The *Polaroid* factors include

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Kelly-Brown*, 717 F.3d at 307 (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).

The Second Circuit has stated that "[o]n appeal from a grant of summary judgment, the findings with respect to predicate facts underlying each *Polaroid* factor are reviewed with considerable deference to the district court."  *Electra*, 987 F.3d at 257 (quoting *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 162 (2d Cir. 2004)).  On its face, this standard of review

appears to be in tension with the requirement that the Court, on summary judgment, "construe the facts in the light most favorable to the non-moving party." *Brod*, 653 F.3d at 164 (citation omitted). The Second Circuit has noted as much, *see Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 328 n.11 (2d Cir. 2020) (noting that "if a genuine dispute existed as to a material fact, the case would normally not be appropriate for summary judgment"), and has attempted to avoid this implication. For example, it referred to "considerable deference" as "an oft-repeated incantation," while noting that the Second Circuit "never purported to expand a district court's license to make factual findings at summary judgment," and concluding that "a district court will be authorized to find the sorts of facts that are entitled to deference only in circumstances in which the traditional summary judgment standard has been satisfied." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020). This clarification is important because it means that the Second Circuit's findings with respect to the *Polaroid* factors—most notably in *Electra*, 987 F.3d 233—do not merely indicate the absence of clear error. Instead, they establish de novo conclusions of law that the Court is bound to follow.

### a.  Strength of the Mark

#### i.  Evidence of Recognition

In *Toth*, the district court explained that "the 'mark' is the plaintiff's persona and the 'strength of the mark' refers to the level of recognition that the plaintiff has among the consumers to whom the advertisements are directed." *Toth*, 2019 WL 95564, at *6 (citation omitted). After considering factors such as the plaintiffs' earnings and social media followings, the court in *Toth*, in deciding that this factor weighed in favor of the defendants, concluded that "[t]he bottom line is that regardless of the plaintiffs' presence on social media, they have failed to cite even one example of actual recognition." *Id.* In *Electra*, the Second Circuit affirmed this

10

focus on evidence of recognizability as the bottom line, stating that "because the ultimate question under *Polaroid Corporation* is the likelihood of consumer confusion, the district court properly analyzed [the plaintiffs'] recognizability."  987 F.3d at 258.  Indeed, the Second Circuit strongly suggested that the absence of evidence of recognition would suffice to defeat a false endorsement claim, quoting a district court's reasoning that "[t]he misappropriation of a completely anonymous face could not form the basis for a false endorsement claim, because consumers would not infer that an unknown model was 'endorsing' a product, as opposed to lending her image to a company for a fee."  *Id*. (quoting *Bondar v. LASplash Cosmetics*, No. 12-CV-1417, 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012)).  Thus, the Court views Plaintiffs' recognizability as a critical requirement to sustain their false endorsement claims, and begins its analysis of the strength of Plaintiffs' marks by assessing whether Plaintiffs have adduced evidence that they are recognized.

The Courts concludes that they have not.  The record contains two possible sources of evidence to suggest recognition.  First is Plaintiffs' affidavits, which state that "[o]n any given day, regardless of where [they are] at, [they are] recognized by complete strangers and [their] fans who follow [them] on social media."  (Campos Decl. ¶ 4; Banx Decl. ¶ 4; Taylor-Johnson Decl. ¶ 4; Swedberg Decl. ¶ 4; Edmondson-Longoria Decl. ¶ 4; Hinton Decl. ¶ 4; Toth-Gray Decl. ¶ 4; Mayes Decl. ¶ 4.)  To defeat a motion for summary judgment, "a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).  Here, Plaintiffs do not refer to any specific examples of being recognized.  (*See* Campos Decl. ¶ 4; Banx Decl. ¶ 4; Taylor-Johnson Decl. ¶ 4; Swedberg Decl. ¶ 4; Edmondson-Longoria Decl. ¶ 4; Hinton Decl. ¶ 4; Toth-Gray Decl. ¶ 4; Mayes Decl.

11

¶ 4.)  Instead, they vaguely state that they are "recognized by complete strangers" "[o]n any given day."  (*Id*.)  These affidavits are "conclusory and completely lacking in evidentiary support."  *Allegheny Coupling Co. v. Betts Indus., Inc.*, No. 06-CV-76, 2010 WL 1068199, at *7 (W.D. Pa. Mar. 18, 2010); *see also Gimix, Inc. v. JS & A Grp., Inc*., 699 F.2d 901, 907 (7th Cir. 1983) (finding that an affidavit that the plaintiffs mark "was well-known as a trademark for [the plaintiff's] product" did not establish an issue of fact); *cf. Applegate v. Top Assocs., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (affirming summary judgment where the plaintiff did not provide "the concrete particulars which would entitle him to a trial"); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (holding, where the plaintiff testified that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places," that "such conclusory allegations . . . are insufficient to satisfy the requirements of Rule 56(e)").

The second possible source of evidence regarding recognition is expert testimony from Martin Buncher ("Buncher").  Buncher offers to testify that "[t]he levels of recognition recorded among respondents were quite significant."  (Golaszewski Decl. Ex. L ("Buncher Report") 30 (Dkt. No. 43-12).)  His putative testimony is based on a survey of 812 people who were at least 21 years old living in the metropolitan area around Mansion, and who had patronized a "Bikini Bar/Gentlemen's Club/Strip Club" in the two years prior to taking the survey.  (*Id*. at 8.)  This survey showed that "almost half of the respondents felt they recognized . . . Plaintiff[s'] images in the ads in some manner having seen them prior to this research."  (*Id*. at 22.)  Defendants argue that this testimony should be excluded as unreliable.  (Defs.' Mem. 28–29.)  The Court agrees.

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the

method by which the expert draws an opinion from those facts, and how the expert applies the

facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 475

(W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d

Cir. 2002)).  "[W]hen an expert opinion is based on data, a methodology, or studies that are

simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the

exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (citation omitted).

However, consistent with "the liberal admissibility standards of the federal rules and [the fact]

that our adversary system provides the necessary tools for challenging reliable, albeit debatable,

expert testimony," the Court "should only exclude the evidence if the flaw is large enough that

the expert lacks 'good grounds' for his or her conclusions." *Id*. at 267 (citation omitted).  "The

decision to admit expert testimony is left to the broad discretion of the trial judge and will be

overturned only when manifestly erroneous." *Electra*, 987 F.3d at 254 (quoting *Boucher v. U.S.*

*Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

   Defendants argue that Buncher's conclusions that Plaintiffs are recognizable lack good

grounds because he "did not show the respondents full face images of . . . Campos, Toth-Gray,

and Mayes." (Defs.' Mem. 28.)  Instead, Buncher "used copies of the images annexed to the

Complaint with . . . [P]laintiffs' names removed from the top, which resulted in large parts of

their faces and heads being removed." (*Id*.)  The Court agrees.  Survey respondents are highly

unlikely to be able to accurately identify Campos, Toth-Gray, and Mayes based on photographs

that do not show their face above their nose.  (*See* Compl. Exs. A, G, H.)  Yet Buncher's study

shows relatively uniform levels of recognition across the images of all eight Plaintiffs, including

those that show a Plaintiff's face and those that do not.  (Buncher Report 22.)  According to

Buncher's survey, the most recognized Plaintiff was recognized by 55% of respondents, while

the least recognized Plaintiff was still recognized by 43% of respondents.  (*Id*.)  Assuming that

each Plaintiff is relatively recognizable, this spread should be significantly larger to account for

the images showing only part of Campos's, Toth-Gray's, and Mayes's faces.  Case law helps

explain the survey flaws that resulted in this anomalous outcome.  In *Edmondson v. RCI Hosp.*

*Holdings, Inc*., No. 16-CV-2242, 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020), *reconsideration*

*denied*, 2020 WL 2731968 (S.D.N.Y. May 26, 2020), the court held that "Buncher's failure to

use a control group also makes it difficult to measure the effect of the specific images on the

respondents or to account for participants' . . . guessing."  *Id*. at *7.  The Second Circuit affirmed

the importance of a control group in *Electra*, rejecting Buncher's explanation that his survey was

"a communications study, not a consumer confusion study" as "insufficient to set aside the

district court's conclusion that the Buncher Report was fatally flawed."  987 F.3d at 258 (record

citation omitted).  (*See* Buncher Report 11 ("[T]his research was a communications . . . study,

negating the need for any control group.").)  Here, Defendants' expert offers to testify that, in the

absence of a control group, "there is no way of distinguishing the true beliefs of the survey

participants from random guessing."  (Klein Aff. Ex. A ("Klein Report") 9 (Dkt. No. 48-1).)

That the results bunch around 50% recognition for each Plaintiff, regardless of whether her

whole face is shown, supports the view that many respondents were guessing.  Another

possibility is that respondents—generally agreeable people who agreed to participate in the

survey—were yea-saying.  (*See id.*)  Because Buncher made no effort to control for these

possibilities, he lacks good grounds for his conclusion that Plaintiffs were recognizable, and the

Court will not permit him to testify to this point based on these survey questions.[3]

---

[3] The recognition questions in Buncher's survey are also defective for the independent
reason that they "provided no opportunity for respondents either to express uncertainty or to
provide the identity of the [p]laintiff."  *Edmondson*, 2020 WL 1503452, at *8.  The Second

Nor can Buncher testify that Plaintiffs were recognized based on responses to his survey's open-ended questions.  Indeed, Plaintiffs do not advance this argument in their briefs.  (*See* Pls.' Mem. 18; Pls.' Opp'n 18, 23 (noting only that "Buncher asked recognition-based questions in this case.").)  The survey respondents do not identify any Plaintiff by name.  (*See generally* Kolb Decl. Ex. M-1 ("Buncher Survey") (Dkt. No. 46-51).)  In *Toth*, the district court similarly noted that the plaintiffs "failed to cite even one example of actual recognition[,] . . . other than the single response out of 636 correctly identifying [Carmen] Electra," for whom the court granted summary judgment.  2019 WL 95564, at *7; *see also Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228, 245–47 (S.D.N.Y. 2019) ("[The] [p]laintiffs have not provided any survey that directly shows . . . specific recognition by [the] [d]efendants' customers."), *reconsideration denied*, No. 15-CV-8168, 2019 WL 5188932 (S.D.N.Y. Oct. 15, 2019).  Of course "it is possible to recognize a person without recalling their name."  *Skinner v. Tuscan, Inc.*, No. 18-CV-319, 2020 WL 5946897, at *4 (D. Ariz. Oct. 7, 2020).  (*See* Buncher Report 22.)  And the Court notes that Campos, Swedberg, Edmondson-Longoria, Hinton, and Toth-Gray have modeled for Playboy, (Campos Decl. ¶ 2; Swedberg Decl. ¶ 2; Edmondson-Longoria Decl. ¶ 2; Hinton Decl. ¶ 2; Toth-Gray Decl. ¶ 2), and the survey results contain at least eleven references to Playboy, (Buncher Survey 454, 685, 753, 787, 805, 821, 941, 958, 1127, 1671, 1773).  However, Playboy itself is a strong brand.  *See Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563, 566 (2d Cir. 1982) ("The district court's finding that the 'Playboy' mark was distinctive and enjoyed wide recognition is uncontroverted."); *Playboy Enterprises, Inc. v. Chuckleberry Pub.,*

---

Circuit has held that such failure "to provide respondents with an opportunity to indicate lack of knowledge" is a "defect[]."  *Electra*, 987 F.3d at 258.  "As a result, the Court has no way to verify whether respondents truly recognized any of the Plaintiffs."  *Edmondson*, 2020 WL 1503452, at *8.

*Inc.*, 486 F. Supp. 414, 420 (S.D.N.Y. 1980) (noting testimony that Playboy has a "high degree of world-wide public recognition"). The references to Playboy in the survey results are generic; most simply say "playboy," "play boy," "Playboy," or "Play boy." (*See, e.g.*, Buncher Survey 454, 753, 821, 941, 1127, 1671, 1773.) The one response that references a Playboy product says "Playboy magazines, lewd/nude magazines & or sex shop." (*Id.* at 685.) No reasonable jury could find that these references suggest that respondents recognized Plaintiffs from their work with Playboy.

Plaintiffs point to a number of out-of-district courts that have allowed Buncher to testify consistent with similar studies. (*See* Pls.' Opp'n 23–24.) Several of these courts have pointed explicitly to a circuit split regarding the admissibility of expert testimony. *See Takeguma v. Freedom of Expression LLC*, No. CV-18-2552, 2021 WL 487884, at *3–4 (D. Ariz. Feb. 10, 2021) ("Under Ninth Circuit law, technical inadequacies—like the lack of a control group—go to the weight of the survey evidence, not admissibility."); *Mitcheson v. El Antro LLC*, No. 19-CV-1598, 2020 WL 7075239, at *4–5 (D. Ariz. Dec. 3, 2020) ("Although the *Edmonson* court cites to other New York cases suggesting a control group is a necessary survey feature, the Ninth Circuit has no comparable mandate."); *Skinner*, 2020 WL 5946897, at *6 ("[The] [d]efendant's argument overlooks a key difference in the standard for admissibility of survey evidence between the Second and Ninth Circuits."). In *Takeguma*, the court points to the Ninth Circuit's decision in *Prudential Insurance Co. of Am. v. Gibraltar Financial Corp. of Cal.*, 694 F.2d 1150 (9th Cir. 1982). *See Takeguma*, 2021 WL 487884, at *4. In *Prudential*, the district court held that the plaintiff's survey "did not meet the reliability requirements necessary to overcome its hearsay character." 694 F.2d at 1155. The Ninth Circuit rejected this "composite conclusion," and held that "[t]echnical unreliability goes to the weight accorded a survey, not its

admissibility." *Id*. at 1155–56.  However, it noted that "[a] few cases do support the position

taken by the district court." *Id*. at 1156.  The Ninth Circuit cited in particular *Am. Footwear

Corp. v. General Footwear Co*., 609 F.2d 655 (2d Cir. 1979).  *Id*.  There, the Second Circuit held

that "in light of [two surveys'] methodological defects,"—including self-serving questions and

failure to replicate actual marketing conditions—"the district court's rejection of this survey

evidence was not clearly erroneous."  *Am. Footwear*, 609 F.2d at 660 n.4.  Rejecting this view,

the Ninth Circuit adopted what it deemed "[t]he majority view[:] . . . to admit the survey and

discount its probative value."  *Prudential*, 694 F.2d at 1156.  Even the cases cited by Plaintiffs

that do not identify a circuit split refer to this Ninth Circuit principle, or a similar principle from

another circuit.  *See, e.g.*, *Pepaj v. Paris Ultra Club LLC*, No. 19-CV-1438, 2021 WL 632623, at

*3 (D. Ariz. Feb. 18, 2021) ("Objections regarding 'technical inadequacies' of a survey, 'bear on

the weight of the evidence, not its admissibility.'" (citation omitted)); *Pinder v. 4716 Inc*., No.

18-CV-2503, 2020 WL 6081498, at *3 (D. Ariz. Oct. 15, 2020) ("Challenges to survey

methodology go to the weight given the survey, not its admissibility." (citation omitted));

*Edmondson v. Caliente Resorts, LLC*, No. 15-CV-2672, 2017 WL 10591833, at *11 (M.D. Fla.

Aug. 31, 2017) ("Objections to the technical validity of the survey properly go to the weight to

be accorded to the survey rather than to its admissibility.").  As the Court is bound to follow the

law of the Second Circuit, it does not find these cases dispositive, let alone persuasive.

Plaintiffs further argue that Defendants failed to adequately brief their critique of

Buncher's opinion regarding whether Plaintiffs were recognized.  (*See* Pls.' Opp'n 18

("Defendants could have attacked Plaintiffs' evidence of actual . . . recognition in their brief,

[but] they did not do so."), 23 ("Buncher asked recognition-based questions in this case.  If

Defendants['] position is that . . . Buncher's questions were nevertheless deficient, then the onus

was on them to explain that position to the Court.  Their silence on such comparisons is telling and dispositive.").)  The Court disagrees.  Defendants argued that Buncher's choice not to "show the respondents full face images of . . . Campos, Toth-Gray, and Mayes" was "an extremely careless failure in methodology that itself undermines the credibility of . . . Buncher's methodology and opinions."  (Defs.' Mem. 28.)  Defendants certainly could have further elaborated, but their brief provided Plaintiffs with ample opportunity to respond to this argument.

### ii.  Other *Electra* Factors

Plaintiffs argue that they are recognizable because each is a "successful model" and they "have substantial followers on their social media accounts."  (Pls.' Mem. 18.)  The Court disagrees.

In addition to affirming the district court's findings as to evidence of the plaintiffs' recognizability, the Second Circuit in *Electra* held that the district court had "properly analyzed the record of each [plaintiff's] public prominence to determine the strength of their marks."  987 F.3d at 258.  Based on this finding, the Court looks for guidance to the *Toth* court's analysis of the plaintiffs' public prominence.  In *Toth*, the district court granted summary judgment to the plaintiff on Carmen Electra's ("Electra's") false endorsement claim, and granted summary judgment to the defendants on the false endorsement claims brought by the other plaintiffs— including Hinton, Toth-Gray, and Mayes.  2019 WL 95564, at *15.  In so doing, it identified three relevant factors beyond evidence of recognition.  First is income.  After noting that "Electra earned over $5,000,000 from modeling between 2009 and 2012," and that the other plaintiffs had made annual modeling incomes ranging "from $400 . . . to $92,000," *id.* at *4, the court concluded that "[u]nlike . . . Electra, none of these other plaintiffs offered evidence of significant income earned through their various appearances," *id.* at *7.  Second is prominence.  The court

explained that Electra had "not just appeared in popular movies and television shows, but had regular and starring roles in them." *Id.*  By contrast, it held that while the other plaintiffs had "participated in promotional campaigns for a wide variety of brands and appeared in magazines, TV shows, and movies, their resumes [were] devoid of evidence that they actually garnered recognition for any of their appearances." *Id.*  The court held that "[s]imply listing brands or magazine titles is insufficient." *Id.*  Third is social media followings.  While the court did not make a finding regarding the size of the plaintiffs' social media followings, it noted that "the operative inquiry" was "what [the] plaintiffs' social media followings were at the time of the publishing of the images at issue"—not their followings at the time the plaintiffs' papers were filed. *Id.*  The Court considers each of these three factors.

First, the Court considers Plaintiffs' income.  Plaintiffs do not make an affirmative showing regarding their income.  "[E]stablishing a likelihood of confusion is the plaintiff's burden . . . ." *Bondar*, 2012 WL 6150859, at *5 (citing *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)).  As a result, Defendants "may satisfy [their] burden [on summary judgment] by 'pointing to an absence of evidence to support an essential element of the nonmoving party's' case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citation and alteration omitted).  Defendants attest that they have provided all of the documents concerning Plaintiffs' income that were produced in discovery. (*See* Kolb Decl. 3–5 (noting that the exhibits to the Kolb Declaration contain all financial documents produced by Banx, Taylor-Johnson, Swedberg, Edmondson-Longoria, Hinton, and Mayes); Defs.' SMF ¶ 9; Pls.' Resp. SMF ¶ 9 (all financial records produced by Campos before her deposition are available as Exhibit A to the Kolb Declaration); Kolb Decl. 5 (supplemental documents regarding Campos's finances are included in Exhibit L to the Kolb Declaration);

19

Defs.' SMF ¶¶ 701–02, 704–05 (all financial documents produced by Toth-Gray, both before and after her deposition, are available in Exhibits K and L to the Kolb Declaration).)[4]  Thus, the Court considers Defendants' submissions regarding Plaintiffs' income.  These submissions include Plaintiffs' deposition testimony, produced documents, and their sworn response to an Interrogatory requesting "[f]or [e]ach Plaintiff . . . all sources of income and revenue from 2010 through the present . . . ." (Kolb Decl. Ex. A ("Campos Dep.") 51 (Dkt. No. 46-3); Kolb Decl. Ex. B ("Banx Dep.") 93–94 (Dkt. No. 46-4); Kolb Decl. Ex C ("Taylor-Johnson Dep.") 114 (Dkt. No. 46-5); Kolb Decl. Ex. D ("Swedberg Dep.") 6 (Dkt. No. 46-9); Kolb Decl. Ex. E ("Edmondson-Longoria Dep.") 101 (Dkt. No. 46-10); Kolb Decl. Ex. F ("Hinton Dep.") 7–9 (Dkt. No. 46-15); Kolb Decl. Ex. G ("Toth-Gray Dep.") 29–30 (Dkt. No. 46-21); Kolb Decl. Ex. H ("Mayes Dep.") 105–06 (Dkt. No. 46-22).)[5]

Based on the available evidence, the Court finds that Plaintiffs are in the same category as the plaintiffs in *Toth* with respect to their income.  While this income is not reflected in Campos's Interrogatory response, (*see* Campos Dep. 51 (Dkt. No. 46-3)), the documents Campos produced suggest that her highest earnings were $42,669.99 in 2013, including $21,350 from Playboy Enterprises, Inc., (Defs.' SMF ¶ 63; Pls.' Resp. SMF ¶ 63; Campos Dep. 35 (Dkt. No. 46-3)), $4,200 from Elegant Moments, Inc., (Defs.' SMF ¶ 103; Pls.' Resp. SMF ¶ 103; Kolb

---

[4] Plaintiffs purport to dispute that Exhibits K and L to the Kolb Declaration contain all of the financial documents produced by Toth-Gray.  (*See* Pls.' Resp. SMF ¶¶ 702, 705.)  A party disputing a fact in a Local Rule 56.1 Statement must cite "to evidence which would be admissible."  Local Civ. R. 56.1(d).  However, Plaintiffs do not identify any specific omissions.  (*See* Pls.' Resp. SMF ¶¶ 702, 705.)  Thus, the Court takes as undisputed that Defendants have provided all financial documents produced by Toth-Gray.

[5] Because some of Plaintiffs' deposition transcripts span multiple filings containing discontinuous page numbers, the Court in referring to them indicates both the ECF-generated page number in the upper right-hand corner and the docket number.

Decl. Ex. L ("Suppl. Disclosure") 22 (Dkt. No. 46-35)), $4,150 from Michele & Group, Inc.,

(Defs.' SMF ¶ 103; Pls.' Resp. SMF ¶ 103; Suppl. Disclosure 23 (Dkt. No. 46-35)), $9,250 from

Shear Enterprises LLC, (Defs.' SMF ¶ 103; Pls.' Resp. SMF ¶ 103; Suppl. Disclosure 24 (Dkt.

No. 46-35)), and $3,719.99 from BRAND Model & Talent Agency Inc., (Defs.' SMF ¶ 103;

Pls.' Resp. SMF ¶ 103; Suppl. Disclosure 25 (Dkt. No. 46-35)).  Banx's highest earnings were in

2006, when she earned $18,300.  (Banx Dep. 94 (Dkt. No. 46-4).)[6]  Taylor-Johnson's highest

income was in 2009, when she earned $40,840 from Leg Avenue Inc.  (Taylor-Johnson Dep. 103

(Dkt. No. 46-5).)  Swedberg's highest income was a total of $107,000 in 2012, when she earned

$100,000 as Playmate of the Year, (Defs.' SMF ¶ 311; Pls.' Resp. SMF ¶ 311; Swedberg Dep. 6

(Dkt. No. 46-9)), up to $3,500 for her role in Snake and Mongoose, (Defs.' SMF ¶¶ 285–86;

Pls.' Resp. SMF ¶¶ 285–86; Swedberg Dep. 22 (Dkt. No. 46-6)), and up to $3,500 for her role in

Paulytics, (Defs.' SMF ¶ 287; Pls.' Resp. SMF ¶ 287; Swedberg Dep. 23 (Dkt. No. 46-6)).

Edmondson-Longoria testified in another matter that her highest annual income was around

$100,000 in 2010 or 2011.  (Defs.' SMF ¶ 411; Pls.' Resp. SMF ¶ 411; Kolb Decl. Ex. Z at 134–

35 (Dkt. No. 46-70).)  Hinton's highest annual income was $57,450 in 2013.  (Hinton Dep. 8

(Dkt. No. 46-15).)  Toth-Gray's highest annual income was $83,250 in 2016.  (Toth-Gray Dep.

30 (Dkt. No. 46-21).)  Aside from a $20,000 annual payment from Hot Import Nights in 2014–

2015, Mayes's Interrogatory response gives her hourly or daily rate rather than annual totals.

(Mayes Dep. 105–06 (Dkt. No. 46-22).)  Mayes testified that three ledgers produced in discovery

were the only documents reflecting her income that she had in her possession.  (Defs.' SMF

¶ 899; Pls.' Resp. SMF ¶ 899; Mayes Dep. 27–28 (Dkt. No. 46-22).)  These ledgers reflect total

---

[6] The Court notes that, in addition to attesting to its accuracy, Banx testified that her responses to Interrogatory 3 accurately reported her earnings from 2005 through 2014.  (Defs.' SMF ¶ 153; Pls.' Resp. SMF ¶ 153; Banx Dep. 44 (Dkt. No. 46-4).)

earnings of $98,083.38 from 2010 through 2016.  (Mayes Dep. 89–96 (Dkt. No. 46-22).)

Construing in Mayes's favor the ambiguous CESD Talent Agency ledger—which does not

contain a date—the most Mayes made in a single year was $74,117.62 in 2010.  (*Id*. at 94, 96.)

There is evidence suggesting that Swedberg and Edmondson-Longoria had peak annual incomes

of $106,000 and $100,000, respectively, which exceeds the $92,000 discussed in *Toth*.  2019 WL

95564, at *4.  However, this excess is fairly small, and Swedberg's and Edmondson-Longoria's

incomes came nowhere near $5,000,000 over a four-year period, which the court in *Toth* found

supported a finding of a strong mark.

Second, the Court considers Plaintiffs' prominence.  All Plaintiffs are situated similarly

to the plaintiffs in *Toth* with respect to their prominence.  Each Plaintiff provides an extensive

list of the magazines and ad campaigns in which they were featured.  (Pls.' SMF ¶¶ 9, 13, 17, 21,

25, 29, 32, 36; Campos Decl. ¶ 2; Banx Decl. ¶ 2; Taylor-Johnson Decl. ¶ 2; Swedberg Decl. ¶ 2;

Edmondson-Longoria Decl. ¶ 2; Hinton Decl. ¶ 2; Toth-Gray Decl. ¶ 2; Mayes Decl. ¶ 2.)

However, the Second Circuit affirmed the *Toth* court's holding that "[s]imply listing brands or

magazine titles is insufficient."  2019 WL 95564, at *7 (citing *Pelton v. Rexall Sundown, Inc*.,

No. 99-CV-4342, 2001 WL 327164, at *3 (S.D.N.Y. Apr. 4, 2001) ("One appearance in a Sports

Illustrated Swimsuit Issue in 1984 and some advertising work for well-known consumer products

does not deliver celebrity status.")).  Thus, these appearances do not suffice to establish

Plaintiffs' prominence.

Most Plaintiffs provide evidence of additional roles beyond magazines and ad campaigns.

Campos appeared in the film "Last Vegas."  (Campos Decl. ¶ 2.)  Banx can "be seen in music

videos, films, a few reality shows, and as a host for numerous events around the world."  (Banx

Decl. ¶ 2.)  Swedberg "appeared in a number of television series such as Badass, Playboy's

Beach House, Pauly Shore's Paulytics, Snake and Mongoose, and most recently the film Muck."
(Swedberg Decl. ¶ 2.)  While Swedberg had a "small role" in Snake and Mongoose, (Defs.' SMF
¶ 285; Pls.' Resp. SMF ¶ 285; Swedberg Dep. 23 (Dkt. No. 46-6)), she testified that she was "a
lead actress" in Muck, (Swedberg Dep. 22 (Dkt. No. 46-6)).  Edmondson-Longoria was a
cheerleader for the Miami Dolphins, participated in The Amazing Race 14, has been a sports
blogger for Playboy online and a co-host of Sirius Fantasy Sports Radio, appeared in "The
Bunny House" documentary, the Trace Adkins video for "This Ain't No Love Song," and
several other television, print, radio, and online outlets.  (Edmondson-Longoria Decl. ¶ 2.)
Hinton made guest appearances on *Baywatch* and *7th Heaven* and served as a TV host for
*Victory Poker* and *Top Rank Boxing*.  (Hinton Decl. ¶ 2.)  And Mayes was "suitcase model #5"
from the hit game show *Deal or No Deal*, has appeared on *Minute To Win It*, *The Tonight Show*,
and *The Jay Leno Show*, and was the cover model and star of the game *Juiced 2: Hot Import
Nights*.  (Mayes Decl. ¶ 2.)  Like the non-Electra plaintiffs in *Toth*, Plaintiffs' "resumes are
devoid of evidence that they actually garnered recognition for any of their appearances."  2019
WL 95564, at *7.  Only Swedberg—who was "a lead actress" in Muck, (Swedberg Dep. 22 (Dkt.
No. 46-6))—and Mayes—who was "cover model and a star of the game *Juiced 2: Hot Import
Nights*," (Mayes Decl. ¶ 2)—have adduced evidence that they had a "starring role[]" akin to
Electra's, *Toth*, 2019 WL 95564, at *7, but neither has made any showing that these productions
were "popular" or that they had "regular" starring roles, *id*.  Thus, no reasonable jury could find
that Plaintiffs' modeling appearances support the view that they have strong marks.

Finally, the Court considers Plaintiffs' social media followings.  As in *Toth*, each Plaintiff
attests to their current social media followings.  (Campos Decl. ¶ 3; Banx Decl. ¶ 3; Taylor-
Johnson Decl. ¶ 3; Swedberg Decl. ¶ 3; Edmondson-Longoria Decl. ¶ 3; Hinton Decl. ¶ 3; Toth-

Gray Decl. ¶ 3; Mayes Decl. ¶ 3.)  However, the Second Circuit in *Electra* held that the district

court "properly analyzed the record of each [plaintiff's] public prominence," 987 F.3d at 258,

and the district court held that "the operative inquiry" was "plaintiffs' social media followings

. . . at the time of the publishing of the images at issue," 2019 WL 95564, at *7.  Thus, evidence

of Plaintiffs' current social media followings does not establish the strength of their marks.

Before the Court is evidence of only Campos's, Swedberg's, and Toth-Gray's social media

followings as of the publishing of the images at issue.  Campos testified that on May 5, 2016 she

had around 700,000 Instagram followers, (Defs.' SMF ¶ 57; Campos Dep. 9 (Dkt. No. 46-2)),

and around 60,000 Twitter followers, (Campos Dep. 9 (Dkt. No. 46-2)).[7]  Swedberg testified that

on May 4, 2015 she had a little more than 500,000 Instagram followers, around 100,000 Twitter

followers, and 500,000 to 750,000 Facebook followers.  (Defs.' SMF ¶ 269; Pls.' Resp. SMF

¶ 269; Swedberg Dep. 20 (Dkt. No. 46-7).)  Toth-Gray testified that on February 14, 2017 she

had around 4,000,000 Facebook followers, around 1,000,000 Instagram followers, and "a couple

hundred thousand" Twitter followers.  (Defs.' SMF ¶ 805; Pls.' Resp. SMF ¶ 805; Toth-Gray

Dep. 13 (Dkt. No. 46-17).)  As in *Gibson*, where the record similarly suggested that "[s]ome

[plaintiffs] have millions of followers," the Court concludes that "[b]ased on their resumes and in

the absence of a[n] [admissible] consumer survey," a reasonable jury could find only that the

plaintiffs are "as recognizable as the parties that prior courts have held to have relatively weak

marks."  391 F. Supp. 3d at 246–47.[8]

---

[7] Plaintiffs neither dispute nor admit Campos's understanding of her Instagram followers
as of May 5, 2016.  (*See* Pls.' Resp. SMF ¶ 57.)  Thus, the Court takes it to be undisputed.  *See
Elwell v. Selective Ins. Co. of Am.*, No. 14-CV-2590, 2016 WL 5928682, at *1 (D.N.J. Oct. 11,
2016).

[8] The Court declines to grant judgment for Defendants based on their incompletely
briefed argument that Hinton, Toth-Gray, and Mayes are collaterally estopped from asserting the

Plaintiffs have provided no evidence of recognition, and the evidence of their income, prominence, and social media followings does not suggest that they have strong marks. Thus, the Court concludes that Plaintiffs do not have strong marks.

### b. Actual Confusion

The Second Circuit in *Electra* stated that "[t]he misappropriation of a completely anonymous face could not form the basis for a false endorsement claim." 987 F.3d at 258 (quoting *Bondar*, 2012 WL 6150859, at *7). Based on this statement, the Court's holding that Plaintiffs provide no evidence that they are recognizable may itself suffice to grant summary judgment against Plaintiffs' false endorsement claim. However, the Second Circuit has held that "[n]o single [*Polaroid*] factor is dispositive." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995). And in *Electra*, the Second Circuit analyzed additional factors. *See* 987 F.3d at 258 (considering evidence of "actual consumer confusion or bad faith"). Thus, the Court will do the same.

To establish actual confusion, Plaintiffs must adduce "evidence that consumers are actually confused as to the origin of a particular product or service or as to whether [Mansion] is sponsored by or affiliated with [Plaintiffs]." *Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018). Because "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion," the Second Circuit has "deemed evidence of actual confusion 'particularly relevant' to the [*Polaroid*] inquiry." *Virgin*

---

strength of their marks due to the court's ruling in *Toth*. (Defs.' Opp'n 7.) "Defendant[s] make[] no showing that the factual circumstances in the cases are the same and warrant the application of collateral estoppel. The bare allegation that the same legal issues have been previously addressed is insufficient." *Mitcheson*, 2020 WL 7075239, at *17; *see also Takeguma*, 2021 WL 487884, at *17 (same).

*Enterprises Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (citation omitted).  Plaintiffs rely on

the Buncher Report to establish actual confusion.  (*See* Pls.' Opp'n 18.)[9]  They summarize

Buncher's conclusion that "62% of survey respondents believed each Plaintiff had some

affiliation, connection[,] or association with Mansion; 75% believed Plaintiffs agreed to sponsor,

promote[,] or endorse Mansion; and 76% of respondents believed Plaintiffs approved Mansion's

use of their images."  (*Id.*; *see also* Pls.' SMF ¶ 51; Buncher Report 27.)  Defendants counter by

seeking to exclude Buncher's testimony.  (Defs.' Mem. 28–29; Defs.' Opp'n 10–15.)  The Court

agrees with Defendants that Buncher's testimony should be excluded, and thus finds that

Plaintiffs' have adduced no admissible evidence of actual confusion.  *See Electra*, 987 F.3d at

258 (agreeing with the district court's finding that the plaintiffs "failed to establish any actual

consumer confusion"); *Toth*, 2019 WL 95564, at *7 (noting that the "plaintiffs' sole evidence of

consumer confusion in this case is a survey conducted by their proposed expert Martin

Buncher").

　　　After showing survey respondents photos from all of the social media posts at issue in

this Action, (*see* Compl. Exs. A–H), Buncher asked the respondents questions "to measure

possible confusion generated by the use of women in the advertising," (Buncher Report 16).

Defendants' expert provides the specific language of Buncher's questions.  (*See* Klein Report 5–

6.)  That language is excerpted below, along with the language of two additional survey

questions that speak to the respondents' view of the relationship between Plaintiffs and Mansion:

　　　　　Considering that these are actually real women shown in these ads and not just
　　　　　fictitious drawings, please indicate using your strangest (sic) impression for each

---

[9] In discussing the sophistication of the consumers in the relevant market, Plaintiffs quote
Slifstein's deposition testimony.  (Pls.' Mem. 17.)  Slifstein testified, in sum, that consumers
viewing the social media posts *could* think that Plaintiffs would be at Mansion.  (Slifstein Dep.
66.)  However, "at most the evidence show[s] a possibility and not the required probability of
confusion."  *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993).

pair of opposing statements the one you think is true based on your personal feelings. Remember, we want your response based only on these ads you are seeing, and nothing else you might have seen or heard previously.

- All of the women shown in these ads <u>have some</u> affiliation, connection or association with those clubs in whose ad they appear
- All of the women shown in these ads <u>do not have any</u> affiliation, connection or association with those clubs in whose ad they appear

- All of the women shown <u>have agreed</u> to sponsor, endorse or promote the club represented in these ads
- All of the women shown <u>have not agreed</u> to sponsor, endorse or promote the club represented in these ads

- All of the women shown in these ads <u>approve</u> of the use of their image in those club advertisements in which they appear
- All of the women shown in these ads <u>do not approve</u> of the use of their image in those club advertisements in which they appear
  . . .
- All the women in these ads <u>probably do participate</u> in the events or activities which take place in the club, and as reflected in the ads in which they appear
- All the women in these ads <u>probably do not participate</u> in the events or activities which take place in the club, and as reflected in the ads in which they appear

- All of the women <u>were paid</u> to be in the ads in which they appear
- All of the women <u>were not paid</u> to be in the ads in which they appear

(*Id.*)

Defendants' opening brief refers to the Klein Report and Klein Affidavit for a discussion of the Buncher Report's "serious methodological flaws." (Defs.' Mem. 28; *see also* Klein Report; Klein Aff.) Among the criticisms in the Klein Report is that Buncher's survey did not instruct respondents "not to guess or [tell] them what to do if they didn't have an answer for a question, were unsure[,] or simply did not have an opinion." (Klein Report 12.) Klein opines that, in the absence of such instruction, "the question likely is a leading question because it leads the respondent away from answering 'don't know' and toward selecting one of the provided options." (*Id.* at 9.) Klein describes such questions as a "way in which respondents are

encouraged (or even required) to guess." (*Id.*)  Defendants' opening brief also refers to two

courts that have struck Buncher marketing research surveys in similar cases.  (Defs.' Mem. 28–

29.)  In *Toth*, the court struck Buncher's testimony in part because his survey "failed to provide

survey takers with an opportunity to indicate lack of knowledge or an instruction for participants

not to guess."  2019 WL 95564, at *8 (citing *Malletier v. Dooney & Bourke, Inc*., 525 F. Supp.

2d 558, 596 (S.D.N.Y. 2007) ("[C]onsumer confusion surveys should be designed to discourage

guessing.").  The Second Circuit affirmed, agreeing that Bucher's survey was "defect[ive]"

because "it failed to provide respondents with an opportunity to indicate lack of knowledge about

how to interpret the use of [the plaintiffs'] images in the advertisements."  *Electra*, 987 F.3d at

258.

      The defect identified by the Second Circuit in *Electra* exists here as well.  Each of

Buncher's survey questions forced respondents to pick between two binary "impression[s]."

(Klein Report 5.)  For example, either "[a]ll of the women shown in these ads <u>have some</u>

affiliation, connection or association with those clubs in whose ad they appear" or "[a]ll of the

women shown in these ads <u>do not have any</u> affiliation, connection or association with those clubs

in whose ad they appear."  (*Id.*)  In reality, a consumer viewing the ads could have had three

impressions: (1) the ads suggest that Plaintiffs were affiliated with Mansion; (2) the ads suggest

that Plaintiffs were not affiliated with Mansion; and (3) the ads do not suggest one way or the

other whether Plaintiffs were affiliated with Mansion.[10]  Only the first of these three impressions

---

[10] This assumes that survey respondents had the same impression for all of the images of
Plaintiffs—another flaw in Buncher's survey that is discussed in the Klein Affidavit.  (*See* Klein
Aff. ¶ 30.)

suggests actual confusion; the second and third do not.[11]  By failing to provide the third option,

Buncher's survey led respondents to answers favoring Plaintiffs.  Respondents that had no

impression about Plaintiffs' affiliation with Mansion had to guess between the two options that

they were provided.  The other questions that get at possible confusion suffer from the same

flaw.  Thus, because Buncher did not give respondents the "opportunity to indicate lack of

knowledge," *Electra*, 987 F.3d at 258, "the significant methodological flaws in the survey

questions render the responses unreliable and liable to mislead a jury."  *Edmondson*, 2020 WL

1503452, at *8.

Plaintiffs argue that Defendants' opening brief is inadequate to exclude Buncher's

testimony.  (Pls.' Opp'n 20–22.)  It is true that Defendants' opening brief does not explicitly

argue that Buncher failed to permit respondents to indicate a lack of knowledge.  (Defs.' Mem.

28–29.)  Nonetheless, the Court finds that Defendants' briefing was adequate and did not

prejudice Plaintiffs.  Defendants' opening brief referred to the Klein Report and Klein Affidavit,

as well as to the *Edmondson* and *Toth* cases.  (*See id*.)  The Klein Report and Affidavit both

argue that Buncher's survey is defective because it did not offer a "don't know" response.

(Klein Report 9; Klein Aff. ¶ 9.)  And the *Toth* and *Edmondson* courts reached this conclusion in

factually similar cases where the same expert sought to offer similar opinions.  *See Edmondson*,

2020 WL 1503452, at *8 (holding that Buncher's failure "to include an option to indicate a lack

of knowledge or understanding" was a "fatal defect[]"); *Toth*, 2019 WL 95564, at *8 (same).

Defendants made no new arguments in their Opposition.  (*See* Defs.' Opp'n 10–15.)  Instead,

---

[11] Indeed, respondents who are not confused seem more likely to have the third impression than the second.  It is logically difficult to see a person in an ad and draw the affirmative conclusion that she has no affiliation whatsoever with the advertiser.  To the Court it seems much more likely that a respondent who is not confused would take the view that the ads do not suggest one way or the other whether Plaintiffs are affiliated with Mansion.

they reiterated their argument that Buncher failed to include the full faces of Campos, Toth-Gray, and Mayes, (*see id.* at 11–12; Defs.' Mem. 28), quoted from the *Electra* opinion, which was issued after Defendants filed their opening brief, (Defs.' Opp'n 11), and quoted extensively from *Toth*, *Edmondson*, and the Klein Affidavit, (*id*. at 12–15), all of which were cited in their opening brief, (Defs.' Mem. 28–29).[12]  Defendants' briefs could have been more explicit, but Plaintiffs had ample notice of the possible grounds for striking Buncher's testimony.  Indeed, Plaintiffs responded to Defendants' arguments, distinguishing *Edmondson* and *Toth*, and identifying contrary authority.  (*See* Pls.' Opp'n 23–24.)

Because Buncher may not testify to actual consumer confusion, and Plaintiffs provide no other evidence of actual confusion, the Court concludes that the ads did not actually confuse consumers.

### c.  Bad Faith

"Under this factor, [the Court] look[s] to 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'"  *The Sports Auth., Inc. v. Prime Hosp. Corp*., 89 F.3d 955, 964 (2d Cir. 1996).  In *Electra*, the Second Circuit held that the plaintiffs "failed to establish . . . bad faith" where "the record merely show[ed] that [the defendants] failed to investigate whether the third-party contractor responsible for the advertisements secured legal rights to use [the plaintiffs'] pictures in the promotional images—not that [the defendants] intended to use the pictures without legal right to do so."  987 F.3d at 258.  The record here is the same.  Plaintiffs provide evidence that Exclusive Events created and published the ads at issue—which

---

[12] Thus, Plaintiffs' request for leave to respond to "arguments made for the first time in Defendants' opposition brief," (*see* Pls.' Opp'n 25), is denied.

Defendants gave it authority to do—and Defendants never asked where Exclusive Events got the images or whether Exclusive Events had the legal right to use them.  (Pls.' SMF ¶¶ 43–47; Defs.' Resp. SMF ¶¶ 42–46; Slifstein Dep. 14–16, 19–21.)  Plaintiffs do not dispute that "Defendants provided Exclusive Events with total control over the[ir social media] accounts."  (Pls.' Resp. SMF ¶ 997.)  As the district court found *Toth*, Plaintiffs do not offer evidence that Defendants "requested the use of any of . . . [P]laintiffs' images in their promotional material" or "knew or had reason to know that their third-party contractors did not have the rights to use the images at issue."  2019 WL 95564, at *9.  (*See generally* Pls.' SMF.)  Thus, "[t]his factor weighs in favor of Defendants."  *Gibson*, 391 F. Supp. 3d at 248.

### d.  Conclusion

The Court assumes without deciding that a reasonable jury could find that the remaining *Polaroid* factors favor Plaintiffs.[13]  However, the Second Circuit in *Electra* considered only the three factors the Court has discussed.  *See* 987 F.3d at 257 ("As is relevant here, these factors include, inter alia, the strength of the mark, evidence of actual consumer confusion, and evidence that the mark was adopted in bad faith.").  Finding that each of these factors favored the defendants, the Second Circuit "conclude[d] that the district court correctly dismissed [the plaintiffs'] Lanham Act claim."  *Id*. at 258.  Thus, while "[n]o single factor is dispositive," *Int'l Info. Sys.*, 823 F.3d at 160, that all three of these factors favor Defendants suffices to dispose of

---

[13] For example, it could find that the similarity of the marks favors Plaintiffs by concluding that Defendants used their pictures to advertise.  *See Jackson v. Odenat*, 9 F. Supp. 3d 342, 358 (S.D.N.Y. 2014) ("Defendants do not dispute that they used actual pictures of [the plaintiff].").  (*See* Pls.' SMF ¶ 42; Defs.' Resp. SMF ¶ 41; Compl. Exs. A–H.)

Plaintiffs' false endorsement claim under the Lanham Act.  Thus, the Court grants judgment for

Defendants on Plaintiffs' false endorsement claim.[14]

### 2.  False Advertising

Defendants argue that Plaintiffs do not come within the zone of interests protected in a

suit for false advertising under the Lanham Act.  (Defs.' Mem. 5–9.)[15]  The Court agrees.

---

[14] Plaintiffs argue that their claim should proceed if they can establish "confusion '*of any kind*, including confusion as to source, sponsorship, affiliation, connection, or identification.'" (Pls.' Mem. 13 (emphasis in original) (citation omitted).)  They argue that prior cases have inappropriately "narrow[ed] the statute by excising that portion prohibiting use of a plaintiff's mark likely to cause confusion as to 'affiliation, connection[,] or association' with a defendant's product." (*Id.* at 12 (quoting 15 U.S.C. § 1125(a)(1)).)  In their Opposition, Plaintiffs argue that "the Second Circuit's decision in *Electra* to only address a test for 'false endorsement' is fatal to Defendants' motion." (Pls.' Opp'n 17.)  The upshot of their argument appears to be that even if Defendants have satisfied their burden of establishing that there was no confusion about Plaintiffs' *endorsement* of Mansion, they have not satisfied their burden with regard to Plaintiffs' *affiliation* with Mansion.  (*See id.*)

This argument fails.  First, Plaintiffs' claim regarding the scope of *Electra* is misleading. Portions of their opening brief on this issue appear to be copied and pasted from the brief that was before the Second Circuit in *Electra*.  *Compare* (Pls.' Mem. 11–13) *with* Brief and Special Appendix for Plaintiffs-Appellants at 16–19, *Electra*, 987 F.3d 233 (No. 19-325), 2019 WL 1992065, at *16–19.  Of course it is fine to reuse relevant briefing material, but it is disingenuous for Plaintiffs to subsequently claim that their position was vindicated when in fact the Second Circuit affirmed summary judgment against them notwithstanding the *Electra* plaintiffs' nearly identical argument.  Second, Plaintiffs' distinction is immaterial.  Their opening brief explained that "whether Plaintiffs have stated a claim for false association should be analyzed based on the Second Circuit's test for trademark infringement." (Pls.' Mem. 13.)  Plaintiffs continued to note that a likelihood of confusion is one of the elements of a trademark infringement claim, (*id.*), and that "[t]o determine likelihood of confusion in the Second Circuit, a court will evaluate the factors set forth in [*Polaroid*]," (*id.* at 14).  In other words, all roads lead to the *Polaroid* test and, as discussed, Defendants have satisfied their burden with respect to the *Polaroid* factors.  The Court's analysis applies with equal force to the claim that consumers were likely confused about Plaintiffs' *association* with Mansion as it does to the claim that consumers were likely confused about Plaintiffs' *endorsement* of Mansion.

[15] To plead a Lanham Act false advertising claim, Plaintiffs must allege that (1) "the statement in the challenged advertisement is false," (2) "the defendants misrepresented an inherent quality or characteristic of the product," (3) "the defendant placed the false or misleading statement in interstate commerce," and (4) "the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill

To satisfy the Lanham Act's zone of interests requirement, "a plaintiff . . . ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 133 (2014).  However, "injury may be presumed" for "a misleading comparison to a specific competing product," because such an advertisement "necessarily diminishes that product's value in the minds of the consumer." *Merck Eprova*, 760 F.3d at 259 (alteration omitted).  Short of false comparative advertising, "'some indication of actual injury and causation' would be necessary in order to ensure that a plaintiff's injury is not speculative." *Id*.  In brief, a plaintiff must show either: (1) that a competitor made a false comparative claim, or (2) actual injury.  *See Dependable Sales & Serv., Inc. v. TrueCar, Inc*., 394 F. Supp. 3d 368, 374 (S.D.N.Y. 2019) ("[A] presumption of injury may arise when an advertisement makes false claims about a direct competitor, but where . . . a misleading advertisement does not make comparative claims about a direct competitor, a plaintiff must demonstrate actual injury.").[16]  It is beyond factual dispute that Plaintiffs have established neither.

First, Plaintiffs and Mansion are not direct competitors.  "Clearly, the parties are not direct competitors, as Plaintiffs are models and Defendant[s] run[] a strip club." *Pinder v. 4716 Inc.*, 494 F. Supp. 3d 618, 637 (D. Ariz. 2020).  Plaintiffs argue that the opposite is true, because "both seek to attract customers and vie for the same dollar via the use of an image of a beautiful woman."  (Pls.' Opp'n 12.)  This argument fails.  While they share a marketing strategy,

---

associated with its products." *Merck Eprova AG v. Gnosis S.p.A*., 760 F.3d 247, 255 (2d Cir. 2014) (alterations, citations, and quotation marks omitted).

[16] Thus, while Plaintiffs correctly note that "direct competition is not required under the Lanham Act," (*see* Pls.' Opp'n 12 (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014))), this principle does not suffice to establish that Plaintiffs have a valid claim.

Plaintiffs and Defendants "each perform different functions within the marketplace." *CDX Diagnostics, Inc. v. U.S. Endoscopy Grp., Inc.*, No. 13-CV-5669, 2014 WL 2854656, at *5 (S.D.N.Y. June 20, 2014); *see also Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 416 (S.D.N.Y. 2013) ("Merck and Acella are not direct competitors, insofar as Merck does not produce finished consumer products . . . ."). To support their argument, Plaintiffs cite *Gray v. LG&M Holdings LLC*, No. 18-CV-2543, 2020 WL 6200165 (D. Ariz. Sept. 23, 2020), *reconsideration denied*, 2020 WL 9074801 (D. Ariz. Oct. 14, 2020). This case is inapposite. The *Gray* court observed that "[t]he modeling and strip-club industries share a common feature: both emphasize appearance and profit off the sexualization of women's bodies." *Id*. at *7. This statement was in the context of considering the "[r]elatedness of the [g]oods" to evaluate "the likelihood of confusion" in connection with the plaintiffs' false *endorsement* claim. *Id*. at *6–7. That two products are sufficiently related that consumers could be confused about the association between them does not suggest that these two products are direct competitors. Indeed, the *Gray* court found that the plaintiffs did not pass the zone of interests test, and could not bring a false advertising claim. *Id*. at *9–10.

Second, Plaintiffs do not establish injury. They have two theories of actual injury. The first is that they are entitled to compensation for Defendants' use of their image. (*See* Pls.' Opp'n 15.) "This assertion misunderstands the nature of a false advertising claim, which is focused on how false assertions in the market harm a plaintiff's present and future prospects." *Mitcheson*, 2020 WL 7075239, at *16. "[A] typical false-advertising case will implicate only the [Lanham] Act's goal of 'protecting persons engaged in commerce within the control of Congress against unfair competition." *Lexmark*, 572 U.S. at 131 (alterations omitted). Unfair competition, in turn, "was understood to be concerned with injuries to business reputation and present and

34

future sales." *Id*. Thus, "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id*. at 131–32; *see also Merck Eprova*, 760 F.3d at 255 (noting that the plaintiff must establish that they have been "injured as a result of the [defendants'] misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products"). Plaintiffs' lost wages "are not within the zone of interests that the Lanham Act protects," *Takeguma*, 2021 WL 487884, at *17, because "[n]ot being hired by Defendant[s] is not equivalent to not being able to compete with Defendant[s]," *Pinder*, 494 F. Supp. 3d at 637. In their opening brief, Plaintiffs refer to two cases to support their claim that "each Plaintiff has been injured by being deprived of the fair market revenue she would have received but for Defendant[s'] misappropriations." (Pls.' Mem. 10.) These cases do not establish that Plaintiffs fall within the Lanham Act's zone of interests, because they are both in the context of damages for a state law right of publicity claim. *See Clark v. Am. Online Inc*., No. CV-98-5650, 2000 WL 33535712, at *8 (C.D. Cal. Nov. 30, 2000) (discussing "the standard for measuring lost profits in a right of publicity case"); *Grant v. Esquire, Inc*., 367 F. Supp. 876, 878, 881 (S.D.N.Y. 1973) (discussing "[Section] 51 of the [NYCRL]" and noting that the plaintiff "will be able to recover the fair market value of the use for the purposes of trade of his face, name and reputation"). In their Opposition, Plaintiffs again cite *Gray* for the argument that "the failure to pay any Plaintiff for the use of her [i]mage harmed each Plaintiff." (Pls.' Opp'n 15 (citing *Gray*, 2020 WL 6200165, at *4).) As discussed, *Gray* concluded that the plaintiffs did not pass the zone of interests test. 2020 WL 6200165, at *9–10. Thus, Plaintiffs cannot bring a false advertising claim based on their lost compensation.

Plaintiffs' second theory of actual injury is that Defendants' use of their images hurts their reputation and business. (*See* Pls.' Opp'n 13 ( "Plaintiffs' uncontradicted testimony is that

their association with a strip club was potentially devastating to their careers.").)  Where, as here "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assocs.*, 735 F.3d at 123 (citation omitted).  Defendants do this. Their Local Rule 56.1 Statement claims that "Plaintiffs have no evidence that any of [them] lost any income or any employment opportunity or suffered any special damages as a result or consequence of [Defendants'] publication of any of their images on its social media."  (Defs.' SMF. ¶ 87.)  In response, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs.*, 735 F.3d at 123 (citation omitted).  Plaintiffs fail to do this.  While they purport to dispute this fact, they state only that "[e]ach Plaintiff testified that she lost the income she should have been paid had Defendants operated through legal channels and paid her for her appearance in their advertisements."  (Pls.' Resp. SMF ¶ 87.)  As discussed, this injury is not within the zone of interests of the Lanham Act.  And Plaintiffs offer no evidence of reputational or other commercial harm.  (*Id.*)[17]  "Plaintiffs have produced no evidence that the alleged association

---

[17] While these facts are neither required to support summary judgment for Defendants, nor would they be dispositive of Plaintiffs' claims had Plaintiffs provided other evidence of reputational or competitive harm, the Court notes that a number of uncontested facts are consistent with the absence of Lanham Act injury.  For example, Campos was never contacted with notice of a refusal to do business or rescission of an offer because of Defendants' ads, (Defs.' SMF ¶ 86; Pls.' Resp. SMF ¶ 86; Campos Dep. 15–16 (Dkt. No. 46-2)); Banx has no knowledge that she lost a job as a result of Defendants' ads, (Defs.' SMF ¶ 161; Pls.' Resp. SMF ¶ 161; Banx Dep. 58 (Dkt. No. 46-4)); Taylor-Johnson is not aware of any job she lost as a result of Defendants' ads because she is "not currently working," (Defs.' SMF ¶ 199; Pls.' Resp. SMF ¶ 199; Taylor-Johnson Dep. 39 (Dkt. No. 46-5)); Swedberg acknowledged no "direct proof" of lost work, (Defs.' SMF ¶ 329; Pls.' Resp. SMF ¶ 329; Swedberg Dep. 13 (Dkt. No. 46-7)); Edmondson-Longoria stopped modeling in approximately August 2012, (Defs.' SMF ¶ 346; Pls.' Resp. SMF ¶ 346; Edmondson-Longoria Dep. 23 (Dkt. No. 46-10)), which is before Defendants' ad including her image was posted in 2016, (Compl. Ex. E); Hinton received no information that she lost a job or opportunity as a result of the ads, (Defs.' SMF ¶ 662; Pls.' Resp. SMF ¶ 662;

with [Mansion] has damaged their reputation or their ability to compete in any fashion." *Pinder*, 494 F. Supp. 3d at 637.  Thus, summary judgment is appropriate for Defendants on the issue of Plaintiffs' lost employment opportunity.

Citing *Lexmark*, Plaintiffs argue that "when a party claims reputational injury from disparagement, competition is not required *for proximate cause*" and that "a defendant who seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product may be said to have *proximately caused* the plaintiff's harm."  (Pls.' Opp'n 13–14 (emphasis added and omitted) (citation and quotation marks omitted).)  These cases concern proximate cause, not the zone of interests.  The two inquiries are distinct.  *See Lexmark*, 572 U.S. at 129–32 (analyzing "Zone of Interests" and "Proximate Cause" under separate section headings); *id*. at 134 ("[A] direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue.").  The Court does not consider law regarding proximate cause in evaluating the Lanham Act's zone of interests.

Finally, citing *Merck Eprova*, Plaintiffs argue that "a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark."  (Pls.' Opp'n 16 (citation omitted).)  This quote relates to an analysis of the appropriate damages, *after* a Lanham Act violation has been established.  *See Merck Eprova*, 760 F.3d at 261.  The same is true for the case cited in *Merck Eprova*.  *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992).  Neither case involved a zone of interests inquiry, perhaps because both involved direct competitors.  *See Merck Eprova*, 760 F.3d at 260 (noting that the parties

---

Hinton Dep. 12 (Dkt. No. 46-12)); Toth-Gray did not know of anyone telling her that they saw her image in the ads, (Defs.' SMF ¶ 794; Pls.' Resp. SMF ¶ 794; Toth-Gray Dep. 10 (Dkt. No. 46-17)); and Mayes had no information that she would cite as evidence that she had lost work or a job as a result of appearing in the ads, (Defs.' SMF ¶ 928; Pls.' Resp. SMF ¶ 928; Mayes Dep. 50–51 (Dkt. No. 46-22)).

were "in direct competition in the folate market"); *George Basch*, 968 F.2d at 1534 (discussing competing wadding metal polish products).  The Court thus rejects this argument.

Because Plaintiffs do not compete directly with Defendants and have failed to adduce evidence of competitive injury, the Court grants summary judgment to Defendants on Plaintiffs' false advertising claim.

### 3. NYCRL Section 51

#### a.  Statute of Limitations

Defendants argue that many of Plaintiffs' NYCRL Section 51 claims are barred by the statute of limitations.  (Defs.' Mem. 30–32.)  The Court agrees.

The Parties dispute the applicable statute of limitations.  Defendants argue that it is one year because Plaintiffs bring "an action to recover damages for . . . a violation of the right of privacy under section fifty-one of the civil rights law."  N.Y. C.P.L.R. § 215(3).  (*See* Defs.' Mem. 30–31.)  Plaintiffs argue that Section 215(3) is inapplicable because Defendants violated their right of *publicity*, not their right to *privacy*.  (Pls.' Opp'n 2–5.)  They say that "[t]he right to publicity protects that value as property," (Pls.' Opp'n 6 (quoting *Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 867 F. Supp. 175, 188 (S.D.N.Y. 1994)), and that the three-year statute of limitations for "an action to recover damages for an injury to property" applies, N.Y. C.P.L.R. § 214(4), (*see* Pls.' Opp'n 10).

Defendants are right.  The Second Circuit clearly resolved this issue in *Electra*, where it held that "the district court correctly held that the one-year statute of limitations applicable in actions under Section 51 of New York's Civil Rights Law barred the claims of all but six of [the plaintiffs]."  987 F.3d at 240.  Many courts in this district have reached the same conclusion. *See, e.g.*, *Brooks ex rel. Est. of Bell v. The Topps Co.*, No. 06-CV-2359, 2007 WL 4547585, at *3

(S.D.N.Y. Dec. 21, 2007) ("[A]n action for right of publicity claims under Section 51 of the [NYCRL] . . . has a one-year statute of limitations."); *Fischer v. Forrest*, No. 14-CV-1304, 2017 WL 1063464, at *5 (S.D.N.Y. Mar. 21, 2017) ("New York law provides for a one-year statute of limitations for right of publicity claims."); *Cummings v. Sony Music*, No. 01-CV-4375, 2003 WL 22889496, at *3 (S.D.N.Y. Aug. 28, 2003) (holding that the "plaintiff's right of publicity claim . . . brought pursuant to [Section] 51 of New York's Civil Rights Law ha[d] a one-year statute of limitations"), *report and recommendation adopted*, 2003 WL 22271189 (S.D.N.Y. Sept. 30, 2003).  Plaintiffs cite one case from New York holding that "recent decisions have clearly labeled the right of publicity a species of property." (Pls.' Opp'n 7 (citing *Factors Etc., Inc. v. Creative Card Co.*, 444 F. Supp. 279, 284 (S.D.N.Y. 1977), *aff'd sub nom. Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978)).)  Among the "recent decisions" cited by this 1977 opinion is *Price v. Hal Roach Studios, Inc.*, 400 F. Supp. 836 (S.D.N.Y. 1975), which held that "in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph." *Id.* at 843.  The New York Court of Appeals has subsequently clarified that "the 'right of publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy." *Stephano v. News Grp. Publications, Inc.*, 474 N.E.2d 580, 584 (N.Y. 1984).  In other words, while the source of the right of publicity was unclear in the 1970s, it is now clear that it is a subset of the right of privacy under NYCRL Section 51, and thus subject to a one-year statute of limitations for "a violation of the right of privacy." *See* N.Y. C.P.L.R. § 215(3).  The newly adopted Section 50-f does not change the outcome. (*See* Pls.' Opp'n 6–7.)  It merely clarifies that publicity rights "are property rights," and thus "freely transferable or descendible." N.Y. Civ. Rights Law § 50-f.  This new provision does not call into question the Court of Appeals' holding that the right of publicity "is

encompassed under the Civil Rights Law as an aspect of the right of privacy." *Stephano*, 474

N.E.2d at 584.  Indeed, Section 50-f is located within an article titled "Right of Privacy."  *See*

N.Y. Civ. Rights Law Ch. 6, Art. 5.  Plaintiffs rely on several cases from Arizona, (Pls.' Opp'n

9–10), but the law there is different, because neither the right of privacy nor the right of publicity

are identified specifically in Arizona's statutes of limitations.  *See* Ariz. Rev. Stat. §§ 12-541, 12-

542.

      Plaintiffs filed their Complaint on October 16, 2018.  (Defs.' SMF ¶ 1; Pls.' Resp. SMF

¶ 1; Compl. (Dkt. No. 1).)  Plaintiffs' claims "accrue[d] on the date the offending material [was]

first published."  *Fischer*, 2017 WL 1063464, at *5 (quoting *Nussenzweig v. diCorcia*, 878

N.E.2d 589, 590 (N.Y. 2007)).  With two exceptions, it is undisputed that Defendants published

Plaintiffs' images more than one year before October 16, 2018.  One image of Campos was

published on May 5, 2016.  (Defs.' SMF ¶ 19; Pls.' Resp. SMF ¶ 19; Compl. Ex. A at 2.)  The

images of Banx were published on January 17, 2016 and January 18, 2016.  (Defs.' SMF ¶ 119;

Pls.' Resp. SMF ¶ 119; Compl. Ex. B at 5–6.)  The image of Taylor-Johnson was published on

September 30, 2014.  (Defs.' SMF ¶ 208; Pls.' Resp. SMF ¶ 208; Compl. Ex. C at 8.)  The image

of Swedberg was published on May 4, 2015.  (Defs.' SMF ¶ 266; Pls.' Resp. SMF ¶ 266; Compl.

Ex. D at 10.)  The images of Edmondson-Longoria were published on January 17, 2016.  (Defs.'

SMF ¶ 364; Pls.' Resp. SMF ¶ 364; Compl. Ex. E at 12–13.)  The images of Hinton were

published on December 23, 2015 and January 2, 2016.  (Defs.' SMF ¶ 450; Pls.' Resp. SMF

¶ 450; Compl. Ex. F at 15–16.)  The image of Toth-Gray was published on February 14, 2017.

(Defs.' SMF ¶ 756; Pls.' Resp. SMF ¶ 756; Compl. Ex. G at 18.)  The Court grants summary

judgment for Defendants on Plaintiffs' Section 51 claims insofar as they are based on one of

these publications.  Plaintiffs' Section 51 claims survive insofar as they relate to the image of

Campos dated "May 5," (*see* Compl. Ex. A at 3), and the image of Mayes dated "March 16,"
(Compl. Ex. H at 20).

### b.  Jurisdiction

Defendants argue that the Court should decline to exercise jurisdiction over Campos's
and Mayes's Section 51 claims.  (Defs.' Mem. 33–34; Defs.' Opp'n 4.)  The Court agrees.

First, the Court finds that it lacks diversity jurisdiction.  Pointing to the damages
calculation in the Chamberlin Report, Defendants argue that the Court has "no jurisdiction over
any claim based on . . . diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in
controversy is less than $75,000."  (Defs.' Mem. 34.)  *See* 28 U.S.C. § 1332(a).  Plaintiffs do not
respond to this argument.  (*See generally* Pls.' Opp'n.)  Nor does the Complaint allege that the
Court has diversity jurisdiction.  (*See* Compl. ¶¶ 4–9.)  *Cf. Sommer v. Aspen Dental Mgmt., Inc.*,
No. 16-CV-3027, 2016 WL 6998665, at *2 (E.D.N.Y. Nov. 30, 2016) (dismissing the plaintiff's
claim for lack of subject matter jurisdiction in part because the plaintiff "[did] not invoke the
court's diversity jurisdiction").  And Plaintiffs have adduced no evidence suggesting that the
amount in controversy ever exceeded $75,000.  *See Pyskaty v. Wide World of Cars, LLC*, 856
F.3d 216, 223 (2d Cir. 2017) ("[A] plaintiff invoking federal jurisdiction must demonstrate a
'reasonable probability' that the amount-in-controversy requirement is satisfied . . . ." (citation
omitted)).  Campos and Mayes "seek the fair market value of Defendants' use of their
intellectual property without consent or remuneration."  (Pls.' Opp'n 8.)  According to Plaintiffs'
expert, this fair market value is $40,000 for Campos and $30,000 for Mayes.  (*See* Kolb Decl.
Ex. N ("Chamberlin Report") 16 (Dkt. No. 46-52).)  The Court considers separately the claim of
each Plaintiff, as "[t]he Supreme Court has long held that separate and distinct claims raised by
different plaintiffs may not be aggregated to satisfy the jurisdictional amount in controversy."

*Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000) (citing *Snyder v. Harris*, 394 U.S. 332, 336 (1969)).  Neither $40,000 nor $30,000 exceeds $75,000, nor do Campos or Mayes adduce additional evidence of damages.  Thus, the Court lacks diversity jurisdiction over Campos's and Mayes's Section 51 claims.

Further, because the Court is entering summary judgment for Defendants on Campos's and Mayes's Lanham Act claims, it declines to exercise supplemental jurisdiction over their Section 51 claims.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Thomas v. Grunberg 77 LLC*, No. 15-CV-1925, 2017 WL 3263141, at *1 (S.D.N.Y. July 28, 2017) (dismissing state claims where the federal claims had been mooted); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003) ("Where the basis for pendent jurisdiction is dismissed, ordinarily so should the state law claims be dismissed.").[18]

### III.  Conclusion

For the foregoing reasons, Defendants' Motion For Summary Judgment is granted and Plaintiffs' Motion For Summary Judgment is denied.  The Clerk of the Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 41, 45), enter judgment for Defendants, and close this case.

SO ORDERED.

DATED:      August  9 , 2021
                   White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[18] Because it is not material to the outcome of the instant Motions, the Court does not consider Defendants' argument that the Court should exclude the damages testimony of Plaintiffs' expert Stephen Chamberlin.  (*See* Defs.' Mem. 29–30.)